The next case on the docket is Freedman & Sons, Inc. v. NLRB. Mr. Kamins, are you ready? Thank you. Good morning. May it please the Court, Scott Kamins from Offutt Kerman on behalf of Petitioner S. Freedman & Sons. We are here based on a petition for review filed by S. Freedman following a National Labor Relations Board decision in order in which it found that, first off, the company improperly or unlawfully suspended its employee, Richard Saxton, in violation of the Act in 2014, July. And then secondly, that the company, related to separate incidents, terminated Mr. Saxton in September of 2014. I'm going to start with the termination incidents first because they're the more substantive. And as a preliminary matter, I want to just briefly touch on the background facts. Mr. Saxton was a CDL driver for the company. On September 29th, 2014, he returned from running his route. His supervisor, Ellis Brown, approached him and said, Richard, I need you to run a truck over to Ryder. Ryder was the leasing company that provided trucks for the company. And they were one of the trucks that had a problem with the window. Mr. Brown looked around. The only driver he saw was Mr. Saxton. Asked him to run the truck over to Ryder. Saxton refused. Said, no, I'm not going to do it. Ask a junior driver to do it. Mr. Brown responded, you know, Richard, you're the only one around. Saxton seemed to get very agitated, started yelling, screaming, said, read your contract. I'm not going to do it. I refuse. The yelling and screaming drew the attention of other people. One of those people was the vice president of operations, J.J. Thompson. Mr. Thompson approached, tried to find out what was going on, then tried to calm the situation. Couldn't do so. Mr. Saxton was yelling, agitated. Finally told Mr. Saxton to go punch out and go home. Mr. Saxton, as he was walking away from the gathering, continued to yell, scream, swear, engage in really outrageous behavior. After he finally moved away, Mr. Thompson went back to his office. Where are you going? Excuse me? Where are you going? Where am I going? The point you're making. The point I'm making is that the termination was not improper. Was not what? Was not unlawful, did not violate the act. And what was the basis for that? You got him in this situation where they're going back, we're talking about truck driving, right? Correct. Warehouse. Correct. He says, I don't have to drive that truck because my bargain agreement says you've got to go to someone's junior. And his owner reaches in the back pocket and pulls out the agreement. Isn't there evidence there are other junior people on the premises? There's even someone who's just coming on board here. So where's the issue? The issue of the disruption and the yelling or cursing? There's three issues, Your Honor. First off. Are you going to be the one that gives them the basis for termination? Or if you think all of them, just tell me. Well, first off, Your Honor, the Supreme Court in the City Disposal Systems case, which created or established the fact that an employee could, like Saxton, refer to a collectively bargained right and create concerted activity out of that reference. That same case that said that if an employer wants to essentially be accepted from certain protected activities in the collective bargaining agreement, it can do so. It can negotiate language in the collective bargaining agreement. The company did negotiate language in the collective bargaining agreement that specifically said, with respect to a steward like Mr. Saxton, that if you have a disagreement with the company, you have to carry out the orders of the company reported to the union. Disagreement. He's got the agreement in his hand. The agreement says you've got to go get a junior person to do it. You can't disagree with that. You don't disagree with what the collective bargaining agreement says. Your Honor, we're So the only disagreement was, is there a junior person on board? Is that right? Correct. Is someone available? Mr. Brown There's a guy who's coming on board, and he looks right at me and says, there he is. He can do it. Your Honor, that was about 20 minutes later after they were yelling and screaming. There was someone that was coming by. At that point, Mr. Saxton was already leaving. That was the person that took the truck over. There was a disagreement. The disagreement was, was there a junior driver available? The supervisor said there's no one else available. Saxton said, you know, have someone else do it. There was a disagreement. The collective bargaining agreement said if there's a disagreement, carry out the orders of the employer, report it to the union, maintain this agreement, and file it. But aren't you arguing this a little bit in a factual bubble? Because there was so much history in this case, you know, starting with, well, first of all, the fact that he was the union steward or the union representative, whatever the term is, and then the fact that they had this dispute over the validity of his license that they had terminated him allegedly for not having a patent or for having an expired license allegedly. Then they reinstated him. I mean, there's a long history here. This didn't just happen on September 29th where there was a dispute over driving. This is an ongoing problem. And the fact that these events took place in late September, right before he was supposed to have a hearing, wasn't he? On a grievance hearing on some actions that he had filed regarding his rights under the contract. So we're talking about a big basket of evidence, and it seems to me that you're trying to kind of cherry pick just one part of it. So if you could address all the evidence and tell us why the ALJ is wrong. Well, yes, Your Honor, and I was proceeding to that, but I wanted to respond to the question. So, number one, that was the first issue with respect to the company negotiated language which said, in the event of a disagreement, this is what you're supposed to do. Mr. Saxon didn't follow that. But it's not factually disputed that there would be, as Judge Wynn said, there would be other junior people were on the premise. It was extremely factually disputed, Your Honor. Mr. Brown, who the ALJ, Mr. Brown was the one who determined that Mr. Saxon was the only person available. Mr. Brown was found by the ALJ to be a religious man, very credible, a good friend of Mr. Saxon, and Mr. Brown was the one who determined that Mr. Saxon was the only driver available. But what you're arguing is that the ALJ believed the wrong witness. Your Honor, the ALJ believed Mr. Brown, said he was a credible witness, and Mr. Brown was the one who said he was the only driver available. Well, the question is, again, one, like in the last case, one of substantial evidence. How is it that there's no substantial evidence to support all the findings? There's some evidence. At the end of the day. And you may not like it. I may think Mr. Saxon's a little rough around the edges, but that doesn't mean it's not substantial. If I can jump ahead, and we've obviously addressed the various arguments in the brief, you have those. But where the main area where there certainly is not substantial evidence, where there's nothing but board speculation, was the termination of Mr. Saxon. Which termination? The only termination that counts. He was only terminated one time. September 29th. September 30th. Except you're saying it happened the next day. We can debate the incidence of whether it was a protected activity. The only termination that counts means a couple of times. Talk about it. Factual one. I'm talking about September 30th. He was previously terminated at one point, but then reinstated by the company after an investigation. And that was in July. So that came out to a suspension. Moving forward, we can debate whether it was protected activity. I think we spelled that out in the brief. We can debate whether he lost the protection of the act, screaming and yelling and so on and so forth. In any event, after those incidents transpired, Mr. Thompson went back to his office. He received a call from Tommy Ratliff, who was the union president. This is September 29th, 2014. You're saying we can debate those incidents. You're saying you don't have to rest your head on those. One that really is on point. Correct. Well, I think they're all on point, but I think this is sort of the bottom line. You're going to move from that and go to something you really think is not debatable. Exactly. What's that? And that is on the conduct that transpired after this whole incident. Mr. Thompson goes back to his office, receives a call from Tommy Ratliff, who was the union president. Mr. Ratliff heard what happened with Mr. Saxon, obviously received the call. He says to Mr. Thompson, you know, J.J., I heard what happened. I'm sorry on behalf of Richard. The company and the union have had a good relationship. Can't we work this out? And J.J. says, hold on a second. We can work whatever out, but Mr. Saxon has not been terminated. I want to make clear Mr. Saxon has not been terminated. Well, he got terminated the next day. That's right. He, after completely separate incidents occurred. Well, on the 29th, though, he was told to punch out and don't come back. He was told to punch out. And don't come back. Well, after that conversation, there was testimony that he was told to punch out. I know he claimed he was told to punch out and did not come back. But in any event. I mean, that's evidence of termination, isn't it, when they say don't come back? After that conversation took place, he talked to Mr. Ratliff, told Mr. Ratliff that Saxon had not been fired. Saxon spoke with Ratliff and with union business agent Wayne Settles, was told you have not been fired, you're going to work tomorrow. Saxon also spoke with Wayne Settles. I'm sorry, spoke with Wayne Settles, also spoke with Ellis Brown, the supervisor, again, told you're not fired, you're coming to work tomorrow. Undisputed. What happened the next day that changes the animus of Mr. Thompson? At that point, Mr. Saxon, on September 29th, you're working, you're not fired, undisputed, sends an email to the HR, had this conversation with Ratliff, he's working, he's not fired. The next day Mr. Saxon comes to work, runs his route. He's asked to come see management to kind of talk about what had happened to work through those issues. Refuses to go, says I don't have to do it. Mr. Saxon never thought he was fired. He didn't refuse to go. He refused to go speak with management because, according to him, he didn't have to. I don't want to, I'm not talking to him. And he walks out. Well, he had a grievance pending that was due for a hearing, what, five days later involving his July termination and suspension. And so, and that gets back to my point about the history of this case. Everything didn't happen right then. There were other things at issue regarding whether he was being fired for his protected activity. And isn't that the issue here? Was it the protected activity, his filing the grievance, which was still being considered and was five days away from hearing, was that the elephant in the room that caused his termination? Or was it the fact that he was insubordinate on September 30th? Isn't that what the ALJ was required to determine? Your Honor, the National Labor Relations Board found that Mr. Saxon was terminated on the 29th. Right. But he was told by everyone, all we have is the record and evidence. And the record and the evidence is that he was told by everyone he wasn't fired. Well, no, but he was also told not to come back. They were saying he was terminated. Afterwards he was told not, that he wasn't fired. And he was also, the clear board precedent is two things that I want to make sure I get in, is number one, to us, there's no basis to include he was fired on the 29th. He was told by everyone he wasn't fired. He didn't believe he was fired on the 29th. That's not why he didn't go see management on the 30th. Well, what about being told not to come back? You're saying that doesn't matter because they said, oh, never mind. I'm saying afterwards, don't come back.  What does that mean? Afterwards he's made clear to him he's not fired. He comes back to work the next day. Then under clear board case law, even if he had a reason to believe he was fired at that time, under clear board case law, which we've cited in our brief, an employer can disavow that representation, which is exactly what the company did by telling everyone, including the union president, you're not fired. He comes back to work. Finally, if there was any doubt what his status was, the company said, come talk to us on the 30th. He had been told he wasn't fired. Again, clear board case law and basic common sense says, if you have any doubt whether you've been fired, go talk to management. Find out. You have to clear it up. That's what the clear board case law says. You can do that. How can the company be stuck with the burden of having him fired on the 29th when everybody told him he wasn't fired? Well, Saxon told, I mean, wasn't this the situation that Saxon told Drayton immediately after the incident that he had been fired? He thought he had been fired. And if they decided to backpedal for whatever reason on their part, why couldn't the ALJ find that he had been fired? Because, Your Honor, the company specifically told him, the president, the union business agent, you're not fired. And he came back to work the next day. Where did he say, where is it in the record to say you're not fired? He talked to Tommy Ratliff. It's undisputed that the company spoke with Tommy Ratliff, the union president. Exactly. And he was told that he should return to the work. He didn't say you're not fired. Mr. Saxon spoke to Settles and Ratliff later that same day and testified he was told it was okay. Everything's okay. I talked to Tommy, Mr. Thompson, come back to work. And again, if there was any dispute, go talk to management when they wanted to talk to you. You can't just take it on yourself. And so the reason why all this makes a difference as to whether he was fired on the 29th or whether he was fired afterward is that the employer is seeking to rely on insubordination in support of the termination date being the later date. Is that correct? Correct. Because the employer doesn't have insubordination on the 29th. Is that where the rubber meets the road here? Where the rubber meets the road is the board. And I'm going into my extra time a little bit. Where the rubber meets the road is that the board did not even consider the reasons why he was fired on the 30th. I'm asking you, is that what makes the difference in this case from your perspective? You have insubordination on the last day he was on the premises. What was that, October 2nd or October 1st? September 30th, Your Honor. Okay. You have insubordination, according to your theory of the case, on that day. But you don't have insubordination. You have an obnoxious guy, probably. But you don't have insubordination for purposes of grounds for termination on the 29th. And that's the difference, it seems to me. Your Honor, there was no. And so you need to address. There was no intention to terminate Mr. Saxon on the 29th. There was no intention to terminate Mr. Saxon at all. The company wanted to talk to its employee to try to get an understanding of, you know, how we're going to work through this. And the employee. That's the difference. The question is not was there an intentional part of the employer to do this. The question is did the employee reasonably believe he had been fired? So when you've got this evidence that tells him, says, you go ahead on the clock out and do not return tomorrow. The next day. And he's already been fired a couple of times. So he goes out, gives this explanation. Talks to the company. He himself says, he's fired. And then you get a subsequent statement from the representatives that says, no, they didn't fire you, or whatever. And then he comes back a couple of days and then he's fired. And so what we could believe everything you're saying, even except your argument. The problem is the ALJ considered everything you just said and then made a determination. He was fired on the 29th because the case law says termination is pretty easy to show. And then what happened subsequently was just a little temporary reprieve from the fact that he had already been fired. That's what the ALJ finds. And if he finds that, our view is that substantial evidence. Not do we like it. Not do we think you have a good story on it. It's that substantial evidence. Why is that not substantial evidence? Because, Your Honor, it was nothing more than speculation, which this Court has repeatedly stated cannot be the basis of a board decision. It's not speculation. It's not speculation that they told him to leave and do not come tomorrow. That's not speculation. So definitely you got that, which case law would say, that's a termination if you had nothing but that. You say it goes on and then you got subsequent information. Here they say, yes, there was subsequent information, but it was just a temporary reprieve. But that speculation, all the evidence was that the union, Saxton, everybody was told. Ultimately he is terminated and it's only a couple days later. And even though you've got intervening facts, coordination or whatever in there, it's not speculation. It's just his perception that, no, he was actually terminated by this stuff that happened there. That's not really the basis. They just made it official the next day. Well, Your Honor, then that's cutting out all aspects of what Saxton did. He worked all day and then refused to speak with management. And, again, that's where the board case law is. He's an employee. If there's any doubt, can't just refuse to go talk to management and stick it with management. Well, at that point he was engaging in protected activity. He had his grievance hearing set. He had already been in consultation with Ratliff, the union president. And you're saying that the fact that he did not go speak to management on that day, after all this animus had been swirling, was grounds alone for firing him? I'm saying, Your Honor, that what Ratliff told him is that you're not fired. Go to work. He went to work. And then he refused to speak with management. Ratliff, tell him you're not fired. See, I understand the record to say Ratliff said go back to work. He said everything's okay. That's what the record says. Thank you. I'll reserve the remaining time. Mr. Seid. Good morning, Your Honor. David Seid for the Labor Board. Substantial evidence supports the Board's finding that the company unlawfully discharged, suspended, and then discharged employee Saxton. Those findings are based primarily on contested credibility determinations and the documentary evidence. In its briefs and, again, in argument this morning, the company has simply either ignored the credited testimony or the documentary evidence. With respect to Saxton's discharge on September 29th, the company appears to concede that he had the right under the contract to work over time and that it was only a question of whether other employees were available. That's simply a factual matter that comes down to both the credited testimony that shows other employees were available as well as the documentary evidence that shows other employees were available. Your Honor, there's a general principle in labor law about work first, grieve later. But in this particular instance, there is a specific contract provision that gives an employee the right to decline to work over time. He had that right. And this morning, the company appears to concede he had that right. And if an employee is required to first grieve that right, it would essentially undermine the entire provision and underpinning of that very specific contract provision. Well, the company says that, well, okay, they had a TIF on the 29th and they sent him home and said don't come back, but then they straightened that out. Then he came in and was insubordinate the next day. And then they lowered the boom on him. So what's the effect of the insubordination? Your Honor, very simply, I mean, not many people – I've fired people in my life and they generally don't come back and work the next day. Two points, Your Honor. First, Saxon is told that day to clock out and not return. And Saxon is never directly told by the company that he's not fired. And to the extent that the company, and the Board very reasonably inferred, because three days later he is given a discharge letter that relies in part on the incident of September 29th when he declined to work overtime. To the extent the company is now trying to buttress its contention about what happened the next day when he declined to meet with management without union representation and putting aside the mischaracterization of some of the facts with that. I set forth in the Board's brief, and I apologize this wasn't a footnote, but at page 54 of the Board's brief in footnote 15, the Board very specifically, we state that the company has never argued to the Board or the Court that Saxon's alleged conduct on September 30th, that's also referenced in the discharge letter, would have independently justified his discharge. And this morning, company counsel was asked that question. Is the company trying to rely on the events of September 30th to show an independent basis? And company counsel didn't really answer the question. And the reason that question was not really answered is because, very simply, before the Board, the company never made that argument. And in its reply brief, very tellingly, the company was silent in its response to the Board's statement in its opening brief. Why does one who reasonably believes that he has been terminated from the fire come back to work and then work for the shift? Your Honor, he came back because the evidence indicates that the union president had had a discussion with the company official and that it was the union's understanding that things had worked out, and that's why he did return to work. But just a couple of days later, Mr. Saxon receives a letter that discharges him based specifically on the events, or based partly on the events of September 29th. And so in that circumstance, the Board can very reasonably infer that this was simply a temporary reprieve, an opportunity for the company to simply get its paperwork in order, put a formal discharge letter together, and that's what he received just a couple of days later after the incident. And so very simply, the events of September 30th have absolutely no bearing on this case. The administrative law judge had found a completely separate violation based on Mr. Saxon receiving the discharge letter on October 1st. The Board did not pass on that finding, that it didn't need to, and understandably didn't need to, because having found that Saxon was discharged based on the company's actions on September 29th, it didn't need to find whether there was an additional violation on October 1st. But that has absolutely no bearing on, again, on any attempt by the company to now try to assert that the events of September 30th somehow formed an independent basis for his discharge. That was simply an argument that was never, ever raised to the Board. Is he working there now? No, Your Honor. After the letter discharging him on October 1st, he has not returned to the company since then. That's correct. And the reason why the Board is here today is because the company has declined to comply, which it does have the right to do. It has declined to comply with the Board order in order to challenge that order before this Court. But what about the use of a racial slur on September 30th? The company simply never relied on that as a basis for the discharge. There was apparently a comment that was made when Mr. Saxon was first asked to meet with management. That is something that the company has raised in its brief to this Court, but it is not something that was relied on. You're saying it never came up before the Board? Not to my knowledge, Your Honor. Unless this Court has any further questions, the Board would simply ask that the Court enforce the Board's order. Thank you, Your Honor. Thank you. Mr. Mooney? Good morning, Your Honor. John Mooney on behalf of Drivers Local 639. I will try to be brief. I think a lot of the points have been covered, but I think it's important for the Court to understand that this focus on this fall of 2014 is but one tile in an overall mosaic that's pretty ugly. You need to view this case starting from back six, eight months before those events. So you're saying when Mr. Saxon wrecked the company vehicle and the company had to incur costs and then they had the big deal about whether the license was expired or lost? It's a continuum of conduct that needs to be put in when you view what happened on September 29 and October 1. What does that do to help us decide the issue? What do you perceive to be the defining issue here? How is that previous conduct informing that issue? I don't think you can examine the conduct on September 29 and October 1 without understanding how they got there. In the first instance, if you're saying, was he terminated on the 29th, we only look at the fact that you just leave and don't come back. Well, he was terminated. The fact that he comes back to work, that he worked for two shifts. Are you saying those previous events are going to help us to understand why he did that? Yes. I think it helps understand what the company was doing. I don't understand why the employee did it because the determination of whether he was terminated is whether he reasonably believed that he was fired. What are those previous events going to tell me why he did what he did? He's told to leave. We all agree that that's the record. He leaves and he sees another employee and says, they fired me again. Those are his words. He's setting up a little strong net. He did, and the record is clear on that, but I don't think we need to do that this morning. He says that to another employee simultaneously with the action. They fired me again. So what's in his mind? I am fired. Does the company ever communicate to him any disavowal of that? No. The discharge letter that they give to him doesn't say we're relying on something that happened after it. The lead paragraph of that discharge letter says, you did something on September 29th. But after he left, I take it your representative did tell him that he was told to not leave or whatever, maybe not be fired or whatever, and then he actually came back. He said, things are okay. Basically, go back, and just putting this in the union's perspective, we're going to try to do something about this. So that's not quite what they said, though. They said, just go back. Just go back. But Judge Wynn was asking me why the union was taking that position. They're going to try to get him back. No, I'm asking why the employee. I'm focusing on the employee. Why did he come back to work? Because the union said, go back. This is the case where they were just playing hardball. That's pretty much your theory, that they've been doing that for six months and that they finally got all their ducks in a row and fired him on the 29th and completed the paperwork a day or two later. It wasn't hardball. It was fastballs at his head repeatedly. Well, okay. They were hardfastballs. They weren't whiffleballs. They weren't whiffleballs. The man had been repeatedly disciplined, repeatedly discharged for reasons that are specious, and I invite you, even before this court, deal with it in the workplace. But even before this court, they say at least 30 times in their papers that Mr. Saxton lied about getting his license. Look at their papers. And the documentary evidence is that they had, on July 2nd, proof from the Motor Vehicle Administration that he renewed it in June and he got a duplicate on July 1st. They had that in their hands, and they continued to say these things to the union, to others, to this court. And you're saying they did that when their own investigator had said that he had been properly reinstated, right? GC-52 is their record. What this is saying is that the animus of this lawyer is clear from beginning to end in this case. It's manifest, Your Honor. My time is up. If there's any other questions, I'd be happy to answer them. Thank you very much. All right, Mr. Kamens. Thank you, Your Honor. Well, how do you respond to what Mr. Mooney said, that there's animus here reaching way, way back. This guy's a pain in the neck, apparently, from the perspective of the company. You know, here you have somebody walking around with a union contract in his back pocket. You know, how irritating that must have been to management that he was calling them on all of the precise rights that he had under the contract. They had argued before about whether his license had expired. And, in fact, he was in the right on that, not in the wrong, in terms of what ultimately factually came to be. But the company seemed to continue to insist, even after its own investigator saw the documentary evidence that it was a duplicate, seemed to insist that the evidence was ambiguous. So there clearly was a lot of ill feeling here. It's not just what happened on September 29th and 30th. So how does that play into the mix? Your Honor, regarding the license issue, Mr. Saxon admitted that he had lied to the company about what had happened. No, that was not. I mean, he says they're there hectoring him. And he says, well, if you say it, it must be true. Come on. He said he lied because he'd been at the NLRB and he thought he wasn't supposed to disclose anything there. That's what's in the record. That argument just gets you nowhere. He said he lied because he'd been at the NLRB and he thought he had a gag order, so if he thought he could disclose that he'd lost the license. But the question here is there's obvious animus. And he was engaging in protected activity. So how does that play into the analysis, if at all, on what happened September 29th and 30th? Just answer that question, if you would. I don't believe it does, Your Honor. So it's irrelevant. There's a 20-year history of Mr. Saxon working there. Answer the question, if you would. Is it irrelevant? Yes. Because I think you have to look at what happened on the 29th and 30th, as far as the events at issue. And what about the fact he had engaged in protected activity, filing a grievance regarding the earlier July termination? Is that irrelevant? Your Honor, I guess in terms of relevant, you have to look at the facts of what happened. Well, no, but answer the question. What about the fact that he engaged in protected activity regarding the early July termination? Is that relevant to the analysis of what happened on September 29th and 30th? I believe it's not relevant to whether he was terminated on September 29th, because all the evidence in the record shows that he was not terminated on the 29th. So irrespective of the animus, the ongoing animus, you're just saying that is not part of what the ALJ can use to make the determination of termination. There were facts that were made up, facts that said that Mr. Thompson was using the extra time to write up a termination notice, that there were facts that were made up that said he had already been terminated on the 29th. Even though he was told he wasn't, there was undisputed evidence in the record from Mr. Thompson, which no one contested, that said, I said to Tommy, I don't know what you're talking about. I didn't fire Richard. I didn't fire him. And then Mr. Saxon testified that he talked to Ratliff undisputed, and Ratliff said everything's okay. And then there's undisputed testimony or evidence in the record that right after that conversations, Mr. Thompson sent an email to HR saying, I spoke with Tommy, told him that Richard wasn't fired. If we think that if we were to conclude that he was fired on the 30th, should the result of that be for this court to remand it to the NLRB to consider that? Our position is that there's no doubt he was fired on the 30th. But is it your position that then we should step into the shoes of the ALJ and decide the case? Well, our position would be that the board reached a conclusion that was clearly an error that's not supported by the facts or law, and that that decision should be set aside, and that no, that it shouldn't be remanded. Well, our position would be that it shouldn't go back to the NLRB, because the NLRB already reached a decision saying he'd be terminated on the 29th. Then decide that he was fired on the 30th for good cause. Well, I don't think the court has to reach that conclusion. I think the court has to respectfully reach a conclusion based on what the board found. Well, we'd have to go against the ALJ's credibility determinations involving the witnesses, would we not? No. Well, we'd have to say that the evidence doesn't support the ALJ's determination was largely based on this animus, wasn't it? Respectfully, Your Honor, nobody testified that Mr. Saxon was fired on the 29th. There was testimony that he was told to go punch out. Okay, but let's just say that you're writing the opinion of this court. So what are you asking us, what are you going to write as a judge to put forth your view of the case? You're going to say the ALJ what? I'm going to write, number one, that in Article 8, Section B of the Collective Bargaining Agreement, the parties agree that in the event of a disagreement, a steward is not supposed to do what Saxon did. So you want us to reinterpret the Collective Bargaining Agreement? I think it says it's a matter of de novo review for this court. It says what it says. Saxon was a steward. It says if you're a steward in the event of a disagreement with a company, you're supposed to carry out the orders and then agree. What did the ALJ fail to do in this case? What would you write in the opinion that the ALJ didn't do that the ALJ should have done? Well, I would write that the ALJ disregarded the clear contractual language stating Saxon's burdens, there was no protected activity. Okay, but we don't do, do we have the whole contract in the record? You do, Your Honor. Okay. The whole contract is there. And to what extent have you argued the whole contract in this record? The only pertinent articles is we are. You're just arguing the one part that favors your position. How do we know what the whole contract says in terms of how it might bear on this issue? It seems to me you're kind of floating a new legal theory here that you're asking us to incorporate your view as a matter of law on what this entire contract says. Your Honor, may I continue to answer? Actually, respectfully, Your Honor, this argument was heavily threshed out in the briefing. Our position was language in Article 8 is clear. The board found, well, no, Article 8 really just is no strike language. Yeah, but how do we know there's not something else in the contract? You're saying that we've got to read the whole contract now and determine whether there's something else that gives the employee the right if he has, for example, protected activity ongoing, that he can take other actions and decline pending the productive. We don't know if there's another contract provision. So you're saying we've got to do all that? No, Your Honor. It's been thoroughly briefed by both sides, our position on Article 8, and then the board's position and the LJ's position regarding Article 12, which is another section of the contract that deals with no strike, no lockout language. And we've cited all the applicable case law regarding contract construction. So at least on that part of the argument, again, the bigger part of the argument to us is that he clearly was not terminated on the 29th. But, you see, the board was rejecting, and then I'll stop, I promise. The board was rejecting your argument as to the contract right, whether he had a right, because the board found as a matter of fact that other drivers were available. So it seems to me that your reliance on that one legal principle is now out the window because the board made a credibility determination there were other drivers available. So now it seems to me you're just asking us to read the whole contract and to say what? I'm not sure. I guess, Your Honor, if I may respond to that. Yeah. First off, the only two individuals involved in this incident or altercation were Mr. Brown and Mr. Saxton. Right. But the board made the credibility determination that there were other drivers available. So that contract provision doesn't carry the day for you. I guess, Your Honor, the LJ found that Mr. Brown was a credible witness. Mr. Brown testified that in his perception Mr. Saxton was the only one available. So there was obviously a disagreement on that. Even if the board found, hey, we think there's other drivers available, they didn't discredit Mr. Brown in that his perception Richard was the only one available. Okay. Okay. Thank you, sir. Thank you very much, Your Honor. Thank you. Okay. We'll come down and greet counsel and then we'll call the next case.
judges: Barbara Milano Keenan, James A. Wynn, Jr., John A. Gibney Jr.